Macklin, Brown, Lenahan & Speer, New York City (Gerald J. McKernan, New York City, of counsel), for respondent.

## STANDARD TOWING CORPORATION v. TIDEWATER COAL DOCKS CORPORATION.

### THE JEAN.

United States District Court
S. D. New York.
March 9, 1949.

HULBERT, District Judge.

Libellant sues to recover the value of the barge Jean, which it delivered under charter to the respondent for the transportation of coal from Port Reading, New Jersey, to respondent's coal dock at 145th Street and Harlem River, in the Borough of Manhattan, New York City. The libel alleges the delivery of the barge in good condition, which the respondent challenges. Of course, no redelivery was possible since the vessel sank.

The Jean was a canal barge about twenty years old. During the 1944 season she was employed in the transportation of bauxite ore from New York Harbor to Oswego with return cargoes of bulk sulphur. The Jean discharged her last such cargo from Oswego at Carteret, New Jersey, five or six days before she went on charter to respondent, and then went to libellant's yard

for inspection and repair. Mr. Evans, who inspected the vessel and supervised repairs "looked her over with caulkers, the scarves and butts above the light water line, (and) renewed any planks that might have been bad". Two caulkers were employed two days and used about twenty pounds of oakum. A daily report was turned in and entered in a book received in evidence, from which it appears that $520.22 was expended for reconditioning the vessel in addition to $365.90, similarly expended in 1943. But the book did not disclose and Vice-President Herrmann could not give any details. Evans testified the vessel was in condition to carry loads. For the use of the boat, the respondent was charged and agreed to pay $16 per day, and the libellant agreed to man the boat with a captain.

On November 29th the barge Jean was taken to "Liberty Stake Boat" off Bedloe's Island where it was grouped with other barges in tiers of three, and towed to the New Jersey terminal of the Philadelphia and Reading Railroad, and loaded with coal. The loading operation was accomplished by dumping coal cars which were on a trestle into a shute and moving the boat back and forth with equipment provided for that purpose to distribute the coal. This operation required from 45 minutes to an hour. The boat was then put into another tow and brought to the Liberty Stake Boat where the tow was broken up in order that the vessels could be taken to the various parts of the Harbor to which they were consigned. The Jean was towed to a rack established and maintained by the City of New York in the East River, about "20 yards" or "100 feet" off East 96th Street. At this point, the captain of the barge deserted her.

The barge remained at the rack for two days awaiting another captain. Finally, it was towed to the respondent's dock at 145th Street on December 6, 1944, about 7 or 7:30 A.M., and a discharge of the cargo was begun. About 2 P.M. this work stopped because considerable water was being encountered in the coal. A sounding was made at that time and there was approximately 3 to 3-1/2 feet of water in the barge. Mr. Harve, who was supervising the discharge of the barge, telephoned to Mr. Herrmann and told him that there was considerable water in the boat, that the captain had not returned, that the cabin door was locked and there was not any pump on the outside. He asked permission to break the lock to get a pump out of the cabin, to which Mr. Herrmann agreed. The lock was broken but no pump was found in the cabin. However, two employees of the libellant arrived in Connors Marine launch, in which they brought a pump from Hoboken.

"They tinkered around with the pump and they decided it was getting dark and they might have some trouble returning through Spuyten-Duyvil to Hoboken so they put the pump in the cabin and left."

The crane engineer had been hoisting some water over the side of the vessel. A hand pump was then put on and operated until 4:30 or 5 o'clock that afternoon, when respondent's men shaping up the coal started to clean the bow to get as much water toward the stern as possible so it could be pumped out. There were two men with boots in the bow and the water was close to one foot on their boots and they were standing in the coal.

On December 7th the Jean was shifted to 147th Street—there was still no captain on board when Harve had a conversation with Mr. Herrmann and told him respondent wanted to get the boat back to the coal pier for another load. Herrmann stated they were making efforts to find the captain or get another one. Late that afternoon, about 3 or 4 o'clock, Harve met the captain coming along 145th Street with a load of groceries under his arm and he went aboard the barge. After a while, Mr. Harve went over to 147th Street where she was moored and found Mr. Williams, libellant's runner, attempting to make some repairs on the pump. He heard a conversation between the captain and Williams who stated that he would either get the pump fixed or get another one. However, the barge was towed to the rack at 96th Street where Walter G. Anderson, who was hired by Mr. Williams, went aboard as captain. The boat was then towed to the Liberty Stake Boat and thence to Port Reading and

loaded with a second cargo of coal, put in a tow on December 14th, and taken back to 96th Street with a stop at the Liberty Stake Boat.

Anderson testified that as soon as the re-loading of the barge at Port Reading began, he saw that she was going to need pumping and he took the gasoline pump out of the cabin and tested it. The engine worked all right but he did not pump any water then because he was busy getting his boat into the tow. When he did get the pump in operation, it worked a few minutes and stopped; again worked a few minutes and stopped. Anderson, who had taken pumps apart and repaired them, found that the difficulty with this particular pump was that the motor was worn out—it could not pick up or throw the water. The tow was then an hour out from Port Reading. He employed the hand pump from about 3 o'clock in the morning to 11 o'clock that night on the way up to the Stake Boat, not steady, but as much as he physically could and then until the barge reached 96th Street, when there was a foot or a foot and a half of water in her. This was around 5 or 6 A.M.

Captain Anderson went ashore to make a telephone call. His wife was then employed in a war plant making bomb sights. When Anderson was hired he received a card from Mr. Williams upon which appeared the latter's telephone number. Anderson had given this card to his wife. He knew she would be leaving the plant, where she worked, at 7 A.M. He called her there on the telephone and asked her to telephone Mr. Williams and tell him the boat was at 96th Street, leaking, and to send a man with a pump as her husband was sick and was going home. She complied. Mr. Anderson testified that he had a bad cold and that the grate in the stove in the cabin in the Jean was broken, that he had propped it up with a brick in order to build and maintain a fire but he could not spend all of his time in the cabin. Moreover, the rack at which the barge was moored was 60 to 80 feet from the shore. He had the opportunity to go ashore when he did but he then had no means and did not know when he would have facility to return to the barge. The weather was very cold and he went home.

When Mr. Harve came to work on the morning of December 15th, he learned that the barge Jean was at the rack at 96th Street. Later that morning he had a telephone conversation with Mr. Williams, to whom he stated that he had been advised by the dispatcher at the Russell Towing Company that the barge Jean was at 96th Street, that there was no captain aboard and that there was a list in her and they could not tow the boat up without a captain. Shortly afterward, Harve received another call from the dispatcher of Russell advising that some of his crew members had been aboard the Jean and that the ship was taking on water, and that unless something was done very quickly she might go aground. He telephoned Williams and told him that Russell was willing to put a syphon in the barge if libellant would grant them permission. He also reported this to Mr. Harkavy, respondent's president. He gave Russell Brothers instructions to syphon the barge, subject to hearing from libellant and they were standing by waiting. They would not do it without permission from Connors Marine, who owned the barge. Mr. Harve also related that in his conversation with Mr. Williams about having Russell syphon out the boat Williams said not let them do it. He was getting a crew over in a launch who would handle it. The witness drove by the rack at 96th Street about 1:15, viewed the Jean, went back to the yard. She was down low in the water at the time. Her bow was about 2 feet above the water and she was more down by the stern. The water appeared almost even with the deck.

About 3:30 P.M. Harve talked again with Williams in an attempt to find out from him what was happening with the Jean, as respondents were still waiting up in the yard so that they could unload the coal. Williams told him he had not heard from his crew yet and would let him know. He had a further conversation, at about 5 o'clock, with Williams but was not able to get any information except that they (the libellant's crew) were still working on the

barge and he had not had any definite word from them.

McIntosh, the captain of the Russell No. 2, received orders on December 15, 1944, to go to the Jean at 96th Street. The Connors Marine launch arrived there practically at the same time he did. His orders were to tow the Jean to 145th Street if it was possible; with or without a captain, and to put a syphon in her. When he got there, the Jean was in a dangerous condition because of which he wanted to syphon her out before he towed her. He had a conversation with the man who had arrived on the Connors Marine boat with pumps. He said they did not need him. McIntosh remained a few minutes. The pumps were not running at the time he left. The Russell No. 2 had the syphon all set up on deck tested and ready to use, but did not do so when McIntosh was told that he was not needed and that they would be able to get the water out of her with the pumps they had there. McIntosh went to a telephone, called his office.

He looked at the sides of the Jean. He could see the water through the sides and near the top log where it was "wore away, chewed away or rotted away". There was a hole there. He observed the stern of the Jean. The stern corners were rather bruised, that is, worn or very wearing. He observed the condition of the caulking. Some oakum was hanging out on the corners. He had seen the barge approximately a week before and she was all right then as far as he knew.

George P. Breen, who was Acting Mate on the Russell No. 2, confirms the testimony of Captain McIntosh. He also testified that the Jean seemed pretty rotten on the starboard side. The water was coming out all over the side.

Harve also testified that libellant's barge Senator Wickes was at respondent's 145th Street dock, and that he had a telephone conversation with Mr. Herrmann during which Mr. Herrmann requested that he ask the captain of the Senator Wickes to take his pump to 96th Street. The captain of the Senator Wickes said he could not do so because his boat was taking water and he had to keep the pump running on her.

I now revert to the testimony of Anderson. When the Jean was being towed up on December 14th with her cargo of coal aboard he saw water leaking from the sides, corners and the stern and all around. He took a little case knife and plugged some cotton, some oakum and old rags in the seems to stop it. He had worked for about a month with the Union Dry Dock driving oakum. He quit that job because of illness. He noticed the starboard side of the boat about 20 feet forward of the stern, which was one of the places he could not get at because the coal was high up. He could see the water running along on the sides, but could not tell exactly where it was coming from. He further testified the way the water was coming into that boat it was leaking all around.

The Court was very favorably impressed by both Anderson and his wife. Anderson was an experienced seaman and the Court believes he was an honest and trustworthy witness.

Marcel, employed by the libellant as captain of a barge called the No. 10, was the man who was picked up by Lawrence on December 15th to pump out the Jean. Lawrence directed him to take a small centrifical gasoline pump off No. 10 and bring it up to 96th Street to pump out the Jean. When they arrived and boarded the Jean, and after he had hooked up the centrifical pump, and run the hose to the syphon box, he went into the cabin to get the gasoline can. The water was about 3 inches on the floor in the cabin. After he put gas in the pump he tried to start it but it only functioned for five minutes and stopped. They tried hard to start it again but it would not start. He recalled that the tug Russell No. 2 came alongside the Jean and he heard her captain say he had orders to take the Jean up the Harlem to 145th Street, and he looked at her and said he would not touch her. Lawrence told the tug captain that he had a centrifical pump there and that he could handle it. About an hour after the tug had gone and they had tried to start this pump again, Marcel adviced Lawrence to go back to the engineer's dock and call up Herrmann and tell him that we would have to have

a syphon because the pump was not functioning.

Lawrence went ashore and when he came back he stated that he was told by Herrmann that the tug was coming and that Marcel should go back to Grand Street. Marcel replied that he was going home to eat supper and then go back to Grand Street. That was 3:30 P.M. What happened after that to reduce the water in the Jean is not disclosed. Lawrence did not appear as a witness, and it was testified that he was too ill. No effort was made to secure his deposition at any time since the libel was filed on the 26th day of March 1945.

Marcel said there was another small pump on top of the cabin of the Jean when he got there but Lawrence said it would not function and that was the reason he came back to Grand Street after the pump was taken off the No. 10.

■ It was, of course, the duty of the respondent to return the barge Jean in the same condition it was when received, reasonable wear and tear excepted. The barge was 20 years old. It was subject to a certain amount of wear and tear riding in the tow and in the discharge of cargoes such as bauxite ore, sulphur in bulk, as well as coal by the usual clam shell bucket or digger.

It would appear from the proof in this case that the leakage of this barge was a natural consequence of her normal operation.

The libellant relies upon Grauwiller Transportation Co. v. Exner Sand & Gravel Corp., 2 Cir., 162 F.2d 90, and O'Brien Bros. v. United States of America and Turner & Blanchard, 2 Cir., 171 F.2d 586. In the former case, the Court said [162 F. 2d 91]:

"* * * The judge found that to load a scow with wet sand and gravel, and to clog the scuppers—which is done lest the water as it drains away may carry off the sand with it—was to invite the seepage of the water through the deck into the hold. A scow delivered for such a purpose needs watching, * * *. Upon seeing that the scow had no bargee on board, the dredging company was put to its choice: either to refuse to load her at all, unattended as she was, or to give her such attention as a competent bargee would have given."

In the latter case, the Court said [171 F. 2d 587]: "As there was no captain aboard the scow, appellant had control of the scow and responsibility for its safety."

These cases are readily distinguishable for in the case at bar the libellant was obligated to furnish the captain. The captain was aboard on both occasions when the barge was loaded with coal. In both instances the captain absented himself without notice to the respondent after arrival at the rack in New York.

■ When Captain Anderson left the barge on the morning of December 15th he telephoned his wife to notify Mr. Williams, the libellant's "runner", that the barge had arrived at 96th Street and was in a leaking condition. Soon thereafter Mr. Harve, respondent's man in charge at the yard, learned of the condition of the barge Jean and notified Mr. Williams. He also notified Mr. Harkavy, president of the respondent, who notified Mr. Herrmann. About the same time, Mr. Herrmann was notified by Mr. Williams. That was at least six hours after the barge Jean had arrived at the rack. Mr. Harve kept in touch with Mr. Williams. He also drove down to 96th Street and observed the condition of the Jean from the shore. He arranged that Russell Tug No. 2 should tow the barge Jean to 147th Street if it were in condition to be towed and if not to syphon it out. But when the Russell No. 2 arrived at the rack, Lawrence, who had been sent thereby the libellant, reached the Jean almost simultaneously, informed the captain of the Russell No. 2 that they had come with pumps and the Russell No. 2 was not needed. The pump on the Jean was not workable, Marcel was sent to Grand Street, East River, for a gasoline pump which did not work, and it is, therefore, established to the satisfaction of the Court that the failure to prevent the sinking of the barge, and the salvage of her cargo, was due to the neglect of the libel-

lant, the inefficiency of its equipment, and the incompetency of its employees.

Decree for respondent dismissing the libel with costs.